UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ENQUEUE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-38-B-W |
| | ) | |
| DATA MANAGEMENT GROUP, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

Defendant Data Management Group, Inc., has moved, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, to dismiss the case based on lack of personal jurisdiction. In the alternative, the defendant asks that the Court dismiss the action based on venue considerations. I recommend that the Court deny the motion.

**Jurisdictional Facts**

Unless an evidentiary hearing is called, the plaintiff must make a *prima facie* showing of jurisdiction by citing record evidence sufficient "to support findings of all facts essential to personal jurisdiction.'" Snell v. Bob Fisher Enter., Inc., 115 F.Supp.2d 17, 20 (D. Me. 2000) (quoting Boit v. Gar-Tec Prods., 967 F.2d 671, 675 (1st Cir. 1992)). The parties have not requested an evidentiary hearing, so resolution of the motion turns on "the pleadings, affidavits and evidence" placed in the record. Id. The plaintiff's properly supported proffers of evidence must be accepted as true and disputed facts must be resolved in favor of the plaintiff. Id. Unsupported allegations in the pleadings need not be credited. Id.

The jurisdictional facts in this case are drawn from the complaint, a memorandum of understanding (MOU) attached to the complaint, affidavits submitted by both parties, and various exhibits attached to the affidavits.  According to the complaint (Doc. No. 1), EnQueue, Inc., a Nevada corporation with its principle place of business in Hartland, Maine, and Data Management Group, Inc. (DMG), a Delaware corporation with its place of business in Hampton, Virginia, entered into a MOU (Doc. No. 1-2) that called for DMG to purchase EnQueue's assets for a certain sum to be paid in monthly installments, according to schedule C of the MOU.  Because EnQueue was a software-related service company, its assets consisted primarily of computer hardware and software, its customer list, existing contracts and good will.  The complete asset list is found in schedule B of the MOU.  The MOU also called for DMG to hire certain EnQueue employees identified in schedule A of the MOU, including Bill Wheeler, EnQueue's majority shareholder and CEO.  Following EnQueue's transfer of its assets to DMG, DMG made only a fraction of its scheduled payments.  DMG also terminated Mr. Wheeler's employment.  The complaint asserts a breach of contract claim and a fraud claim.  The fraud claim alleges that DMG never intended to pay the negotiated price for EnQueue's assets and that it intentionally misrepresented it would in order to induce EnQueue to transfer its assets.

Bill Wheeler lives, and the offices of EnQueue were located at, 23 Cornell Road, Hartland, Maine.  (Wheeler Aff. ¶ 1, Doc. No. 10-2.)  In June of 2005, Adrian So, an EnQueue employee, communicated with Keith Boyer, the CEO of DMG, concerning EnQueue's interest in merging its operations with a larger firm like DMG.  Boyer was interested in such a combination and discussions were arranged between Keith Boyer and Wheeler.  (Id. ¶¶ 5-6.)  Boyer expressed that his primary interest was to acquire

EnQueue's principle employees, because of their specialized knowledge and customer contacts.  Wheeler sent Boyer several resumes that identified EnQueue as a company based in Maine.  (Id. ¶ 7; Adrian So Resume, Doc. No. 10-3; Robert Wing Resume, Doc. No. 10-4; Geoffry Houze Resume, Doc. No. 10-5.)  Emails Wheeler sent to Boyer provided a Maine telephone number for Wheeler.  (Wheeler Aff. ¶ 8.)  Wheeler referred Boyer to EnQueue's web site, which then prominently displayed EnQueue's Maine address.  (Id. ¶ 9.)  Wheeler sent Boyer a spreadsheet identifying past and present customers, including a handful of larger Maine businesses.  (Id. ¶¶ 10-11.)  Boyer indicated that DMG desired to expand its customer base beyond its own southeastern US market and into the northeastern market and he expressed particular interest in obtaining EnQueue's client base of larger businesses.  (Id. ¶ 10.)

After the MOU was executed in June 2005, a DMG employee came to Maine to pick up some of EnQueue's hard assets and Wheeler and Robert Wing went to work for DMG from their respective home offices in Maine.  DMG paid Wheeler's cell phone, internet and office telephone expenses.  DMG sent Wheeler a business card order form, on which he indicated his home address as his office address.  (Id. ¶¶ 12-14.)  As part of their work for DMG, Wheeler and Wing called on former EnQueue accounts, including the aforementioned Maine businesses, to solicit their patronage on behalf of DMG.  (Id. ¶¶ 16-17.)

In support of its motion to dismiss DMG relies on affidavits from Carolyn Boyer, its president, and Keith Boyer, its chief operations officer.  According to Keith Boyer, DMG does not and has not advertised its services in Maine and never solicited business in Maine.  Nor, according to Keith Boyer, does DMG own any property situated in

Maine.  (Keith Boyer Aff. ¶ 7, Doc. No. 7-3.)  Keith Boyer relates that in June of 2005, Adrian So contacted him to see if DMG would be interested in acquiring EnQueue and that he understood that Mr. So lived in New York or New Jersey.  (Id. ¶¶ 8-10.)  Mr. Boyer agreed to talk about such an acquisition with Mr. Wheeler.  (Id. ¶ 10.)  Boyer and Wheeler discussed the matter by phone.  There is no indication that EnQueue's physical location was a topic of discussion.  Wheeler asked Boyer to sign a non-disclosure agreement in connection with their discussion.  Carolyn Boyer signed the agreement, which identified EnQueue as "a Nevada corporation having offices at 237 Tramway, Suite B, Lake Tahoe, Nevada 89449-6957."  (Id. ¶¶ 12-13; Confid. and Non-Discl. Agreement, Doc. No. 7-4.)  According to Keith Boyer, DMG was never aware that EnQueue had any connection with the State of Maine.  (Keith Boyer Aff. ¶ 14.)  Eventually, Wheeler traveled to Hampton, Virginia, to negotiate and finalize the deal.  (Id. ¶¶ 16-17.)  At no time did anyone from DMG travel to Maine in connection with the negotiation or execution of the deal.  (Carolyn Boyer Aff. ¶ 7, Doc. No. 7-2.)

Keith Boyer indicates that he first became aware of a Maine connection when he reviewed Mr. Wheeler's flight information, which indicated he would be departing from the Bangor, Maine, airport.  (Keith Boyer Aff. ¶ 16.)  The meeting in Virginia culminated in the execution of the MOU.  (Id. ¶ 19.)  Keith Boyer acknowledges that it was Mr. Wheeler's responsibility, after he became a DMG employee, to bring in the business he represented he could bring in and to manage EnQueue's former clients and employees.  (Id. ¶ 23.)  According to DMG, Wheeler never succeeded in delivering any contracts from companies in Maine.  (Id. ¶ 24.)  Following the termination of Wheeler's

4

employment in November 2005, DMG has made no further effort to solicit or conduct business in Maine.  (Id. ¶ 30.)

## Discussion

The Court recently mapped the personal jurisdiction framework in Cormier v. Fisher:

> Because this is a diversity case, the Court's authority to exercise personal jurisdiction over a non-resident defendant is limited by the state of Maine's long-arm statute.  See Am. Express Int'l., Inc. v. Mendez-Capellan, 889 F.2d 1175, 1178 (1st Cir. 1989).  As Maine's long-arm statute permits jurisdiction over non-resident defendants to the "fullest extent permitted by the due process clause of the United States Constitution, 14th amendment", 14 M.R.S.A. § 704-A(1), the inquiry focuses on whether the assumption of jurisdiction would violate due process.
>
> Due process requires that the defendant have "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Int'l. Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  See also Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780-81; World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).  Minimum contacts are determined by whether the defendant purposefully avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (citing Hanson v Denckla, 357 U.S. 235, 253 (1958)).
>
> To establish personal jurisdiction over a non-resident defendant, the plaintiff must demonstrate that the defendant is subject either to "general jurisdiction" or "specific jurisdiction." "[A] defendant who has maintained a continuous and systematic linkage with the forum state brings himself within the general jurisdiction of that state's courts in respect to all matters, even those that are unrelated to the defendant's contacts with the forum." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999) (citations omitted).  Absent general jurisdiction, this Court may still assume jurisdiction if the claim "relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." Id.  See also Donatelli v. Nat'l. Hockey League, 893 F.2d 459, 462-63 (1st Cir. 1990).  This is dubbed "specific jurisdiction."  See generally RF Techs. Corp. v. Applied Microwave Techs., Inc., 369 F. Supp. 2d 24, 28-30 (D. Me. 2005); Harlow v. Children's Hosp., 432 F.3d 50, 56-58 (1st Cir. 2005).

5

404 F. Supp. 2d 357, 360-61 (D. Me. 2005).  DMG contends that its connections with the Maine forum have been so ephemeral that an exercise of either general or specific personal jurisdiction over its person would not comport with due process.  In opposition, EnQueue makes a run at the relatively lower specific jurisdiction hurdles.  (Pl.'s Mem. at 4, Doc. No. 10.)  Those hurdles consist of the relatedness standard, the purposeful availment standard, and a series of gestalt factors.

*Relatedness*

DMG argues that specific jurisdiction cannot be established under the circumstances of this case because both claims turn entirely on DMG's failure to do what it promised to do and neither the promise nor its breach occurred in Maine.  (Mot. to Dismiss at 9-11, Doc. No. 7.)  DMG points out that contract discussions commenced between Adrian So and Keith Boyer, neither of whom was situated in Maine, and culminated with the focused discussions in Virginia that produced the MOU.  (Id.) Although DMG does not dispute the existence of EnQueue's Maine ties or its acquisition of Maine-based assets, DMG asserts that it is of far greater significance that the initial and final contract discussions did not transpire in Maine.  (Id.)  As for the alleged breach, DMG argues that EnQueue's expectation of payment in Maine is not a sufficient forum connection, standing alone, to meet the minimum contacts requirement.  (Id. at 11.)

Although contacts associated with the formation and breach of a contract are certainly significant for purposes of the specific jurisdiction analysis in a contract case, EnQueue is entitled to meet its burden more broadly by asking the Court to draw inferences about the parties' negotiations in relation to the "contemplated future consequences" of their contractual relationship.  Jet Wine & Spirits, Inc. v. Bacardi &

6

Co., 298 F.3d 1, 7 (1st Cir. 2002) (internal quotation marks omitted).  Practically speaking, the inquiry is much the same for the fraud claim, but the analysis turns on whether the defendant's forum contacts "form an important, or at least material, element of proof in the plaintiff's case."  United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992) (internal quotation marks and citation omitted).  The tort concepts of proximate causation and foreseeability play into this analysis.  Id.  Importantly, whether the question is addressed in terms of a contract claim or a tort claim, promises or misrepresentations about future performance are highly significant because they are "the real object of the business transaction."  Burger King Corp., 471 U.S. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 317 (1943)).

      Among the inferences available in this case is that DMG promised to absorb EnQueue into its "group," knowing that EnQueue's principal place of business was in Maine, and promised to employ Wheeler to continue developing EnQueue's business contacts in Maine on behalf of DMG, from an office located in Maine, as part of an effort to expand DMG's business into the Northeast.  These promises dovetail with almost all of the elements of the underlying claims because they concern contemplated future consequences of DMG's contract with EnQueue that are directly tied to the Maine forum and that EnQueue relied on to its detriment.  Additionally, DMG's eventual abandonment of that objective and its alleged breach of its promise resulted in the acquisition, allegedly on false pretenses, of virtually all of EnQueue's assets.  Chief among these assets were certain personnel who appear to have been managed by Wheeler from the Maine office, even if most were located outside of Maine.  Also significant were hardware and software

assets needed to run EnQueue's consulting business.  These assets were located in Maine and DMG retrieved them from Maine.  Finally, DMG allegedly obtained, under false pretenses, certain intangible assets such as EnQueue's good will in the Maine market, something that the parties treated as having appreciable value.  These collected forum contacts demonstrate more than an attenuated relationship with the forum, such as when the defendant merely communicates with various entities in the plaintiff's forum for purposes of rendering a service to the plaintiff in the defendant's forum, e.g., Harlow v. Children's Hosp., 432 F.3d 50, 62-63 (1st Cir. 2005), or where the defendant merely fails to make payments to the plaintiff in the plaintiff's forum based on obligations formed in another forum, e.g., Phillips Exeter Acad., 196 F.3d at 291; cf., Platten v. HG Berm. Exempted Ltd., 437 F.3d 118 (1st Cir. 2006).  The difference here is that the anticipated future consequences of the parties' contractual relationship included an ongoing relationship targeted at the Maine forum, whereby EnQueue would manage its existing business relationships so these intangible assets could be transferred to DMG, just as EnQueue's tangible assets had been.  Also significant is the fact that this enterprise was actually embarked upon, even if only for a short while.  These forum contacts are important, or at least material to, the elements of EnQueue's contract and tort claims.  That suffices to clear the relatedness hurdle.

*Purposeful availment*

In addition to being related to the plaintiff's claims, the defendant's contacts with the forum must reflect a "purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable."

United Elec. Radio & Machine Workers v. 163 Pleasant St. Corp., 987 F.2d 39, 43 (1st Cir. 1993) ("163 Pleasant St. II").  The test requires the Court to consider whether DMG's contacts with Maine reflect "voluntary action" on its part that should have placed it on notice that it "might one day be called to defend [itself]" in a Maine court.  Jet Wine & Spirits, Inc., 298 F.3d at 11.  This test is designed to protect the defendant from being "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." Burger King. Corp., 471 U.S. at 475.  DMG argues that it did not purposefully avail itself of the privilege of doing business in Maine because it did not initiate discussions with EnQueue, the MOU was executed in Virginia, and DMG did not establish any continuing relationship with Maine customers.  (Mot. to Dismiss at 12-14.)  I conclude that the record and the inferences that can be drawn from it support a finding that DMG deliberately folded EnQueue into its organization knowing that it was based in Maine and intending that it continue to develop client relationships in Maine for the benefit of DMG. DMG also permitted that enterprise to go forward for a period of months.  Such deliberate conduct with respect to a Maine-based business entity makes it reasonably foreseeable that litigation might arise in Maine, at least with respect to that business relationship.  By clearing this second hurdle EnQueue meets its *prima facie* burden and the court must then determine if it is contrary to notions of fair play and substantial justice to subject DMG to this Court's jurisdiction.

*The gestalt factors*

When a plaintiff succeeds in demonstrating relatedness and purposeful availment, the court's exercise of jurisdiction over the person of the defendant is proper unless

9

certain "gestalt factors" make the exercise of jurisdiction otherwise unfair or unjust. 163 Pleasant St. II, 987 F.2d at 46.  The prescribed factors are

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Id.  According to DMG, it would be unfair to exercise jurisdiction over it because "[i]t would be onerous for DMG, as an out-of-state corporation that does not do business in or around Maine, to appear and defend this matter in Maine." (Mot. to Dismiss at 15.) DMG also highlights that it did not understand, until later in its negotiations, that it was dealing with a Maine-based enterprise. (Id.) These arguments are unpersuasive because they are counterbalanced by EnQueue's interest in obtaining convenient and effective relief in Maine.  Moreover, although DMG did not initially understand that it was dealing with a Maine-based business, that fact only serves to highlight the fact that it well understood the Maine connection by the time the MOU was executed.  DMG also argues that the burdens of jurisdiction would be unduly great because "virtually every witness . . . resides outside the forum." (Id. at 15.) It cites Keith Boyer's affidavit testimony that most of EnQueue's employees did not reside in Maine. (Id., citing Keith Boyer Aff. ¶ 25.) The problem with this argument is that, assuming that they are likely to be needed as witnesses, there is no evidence that these employees currently reside in a location that would make a Maine trial any more burdensome than a Virginia trial.  What we know is that the Boyers live in the Virginia area and that Mr. Wheeler lives in Maine.  I fail to see any great injustice in having the Boyers travel to Maine as opposed to having Mr. Wheeler travel to Virginia.  Finally, DMG argues that "Maine does not have an interest in

10

. . . this dispute." (Id.) This argument is the weakest of all. Maine's jurisdiction statute asserts that anyone who, among other things, causes the consequences of a tortious act to occur in Maine is subject to the jurisdiction of the State's courts. 14 M.R.S.A. § 704-A(2)(B). Maine obviously has a legitimate interest in harms committed against a business operating in Maine when the harm arises out of the defendant's deliberate contacts with the forum. DMG's effort to hobble EnQueue based on the gestalt factors comes up short.

*Change of venue*

DMG argues in the alternative that this Court is not an appropriate venue for this dispute. The applicable venue provision of Title 28 states:

> (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). DMG argues that venue is improper because "a substantial part of the events or omissions giving rise to the claim" did not occur here. (Mot. to Dismiss at 15-16, quoting 28 U.S.C. § 1391(a)(2)). The difficulty with this argument lies in subsection (c) of the venue provision, which reads: "For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). Because DMG is a corporate defendant it is deemed to reside in the District of Maine for purposes of venue, so long as the Court agrees that it is subject to

11

this District's jurisdiction.  By extension, venue is proper in this District pursuant to § 1391(a)(1), quoted above.  See Rodriguez v. Dixie S. Indus., Inc., 113 F. Supp. 2d 242, 255 (D. P.R. 2000); Topliff v. Atlas Air, Inc., 60 F. Supp. 2d 1175, 1179 (D. Kan. 1999).

## Conclusion

For the reasons set forth above, I RECOMMEND that the Court DENY the defendant's motion to dismiss (Docket No. 7).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C.  636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


July 30, 2007                                                              /s/ Margaret J. Kravchuk
                                                                           U.S. Magistrate Judge