UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ENGUEUE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 7-38-B-K |
| | ) | |
| DATA MANAGEMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION[1]**

**Findings of Fact and Conclusions of Law**

On July 15-16, 2008, I conducted a bench trial on the plaintiff's claim of breach of contract and fraud and the defendant's counterclaim alleging breach of contract, fraud and unjust enrichment.  These are my findings of fact and conclusions of law.

**I.  Findings of Fact**

1.  EnQueue, Inc., the plaintiff and a Nevada corporation with a principal place of business in Hartland, Maine, was formerly in the business of providing consultants to business entities and others to address issues including, but not limited to, training relating to data management and data reporting and retrieval arising from various computer platforms that those entities employed.  EnQueue's "niche" in the market evolved into a specialty related to using "Crystal Reports" to manage data from a "SAP" platform, a computer platform often used by large business entities, such as Johnson & Johnson.

---

[1]     Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

2.  Data Management Group ("DMG"), the defendant and a Delaware corporation with a principal place of business in Hampton, Virginia, is also in the business of providing consultants to businesses.  DMG and EnQueue were not direct competitors in the marketplace, although they overlapped in some areas and both of them partnered as sub-contractors with a third entity, Business Objects.  DMG had no special expertise regarding the "SAP" computer platform, but did work with the "Crystal Reports" reporting program which pulls data from various computer platforms.

3.  Bill Wheeler, the founder of EnQueue, began the company in early 2002 with two or three other individuals, including Jeffrey Houze.  By June of 2005 Wheeler was EnQueue's Chief Operations Officer and Houze was the Chief Technology Officer.

4.  Keith Boyer founded DMG in 1995 as the sole proprietor.  Currently his wife, Carolyn Boyer, is the CEO of the company and his long-time accountant, David Schmidtknecht, is the chief financial officer.  Today DMG has approximately 50 employees and Boyer remains in charge of day to day decisions regarding the company.  His company is in the business of "BI," an acronym for "business intelligence," providing clients with training and consulting services involving data management issues.

5.  During EnQueue's  first year of operation, January through December 2002, it had gross revenues of $394,569.45 and by its third year of operation, January through December 2004, the gross revenues were at $866,957.75.

6.  The company's growth in gross revenues does not give the complete picture.  By mid-2005 EnQueue was experiencing significant problems, including the following: (1) the company had not paid its state unemployment taxes and had to make a payment to the State of Maine;  (2) the company had failed to pay payroll taxes and faced a looming

crisis with the IRS;  (3) of the five consultants who actually worked in the field for EnQueue and generated the bulk of the revenues, two had left the company because of "burn out" and personal reasons, leaving EnQueue short of consultants to perform the work required by their clients;  (4) Wheeler himself had health problems that culminated in cardiac surgery in the Fall of 2006, after the events giving rise to this lawsuit.  Wheeler feels that part of his exhaustion and inability to keep up during early 2005 was related to his heart condition, even though he had not yet been diagnosed;  (5) in 2004 EnQueue took on a new product line involving a training software for on-line, web based training and spent approximately $150,000 developing the software, but ultimately had to abandon the project without any means to recoup the investment;  (6) Wheeler charged business expenses to his personal American Express account and the account was in arrears;  (7) the 2005 gross revenues were lagging behind those in 2004, resulting in only $ 243,077.58 in gross profit as of June 30, 2005;  and (8) although EnQueue paid its consultants between $ 60,000.00 and $ 70,000.00 per year, Wheeler's salary for 2004 was $ 18,000.00.

7.  In the Spring of 2005 EnQueue began negotiations with Claraview, another company in the same general consulting business, hoping to consummate a sale of the company's assets.  Wheeler wanted $ 275,000.00.  Claraview initially offered $ 200,000.00 and then reduced its offer to $ 150,000.00, suggesting that negotiations were not proceeding favorably for Wheeler.

8.  In early June, Adrian So, one of EnQueue's consultants, contacted Keith Boyer of DMG to arrange a telephone meeting between Boyer and Wheeler.  So was known to Boyer because of overlapping work that they had done on the same projects and Boyer

respected So's expertise.  Boyer agreed to the meeting and spoke directly with Wheeler that very evening at So's insistence.  Wheeler and So both stressed to Boyer that time was of the essence because of the looming IRS crisis, the inability of EnQueue to deliver on work in its pipeline because it was short staffed, and the general financial distress of the company.  Boyer was led to believe there was a July 1, 2008, deadline for the company or it would lose its IRS employer identification number, effectively putting it out of business.[2]

9.  Boyer was willing to speak with Wheeler because of Adrian So's good reputation within the Business Objects community of partners and because he had some knowledge of EnQueue's focus on the SAP computer platform.  On one occasion the two companies had worked on the same project in differing capacities as a result of business separately referred to each of them through Business Objects.  As of June 2005 DMG did not offer specific consulting in the SAP arena and Boyer saw a potential for some synergy between the two entities.  Although Boyer was interested in growing his company, DMG had never before been involved in any serious merger or acquisition discussions.

10.  Following further telephonic communications, EnQueue and DMG entered into a nondisclosure agreement on June 8, 2008, exchanged some preliminary information and met for a face-to-face meeting on or about June 17, 2005.  The meeting took place in Hampton, Virginia with Geoff Houze and Bill Wheeler representing EnQueue and Keith and Carolyn Boyer and David Schmidtknecht representing DMG.

---

[2]     At trial Wheeler denied that there was any "deadline" or that he was in immediate distress over the IRS problems.  However, I accept Boyer's testimony that So and Wheeler led him to believe that it was extremely important to move quickly because of a looming IRS crisis for EnQueue.  Whether there really was an impending deadline imposed by the IRS is really beside the point.  I specifically reject the notion that DMG felt any sense of urgency regarding this "deal" because of a competing offer from Claraview.

11.  Wheeler opened the meeting by indicating that he was looking for between $ 500,000 – $ 750,000 for his company.  Boyer responded that he did not have the cash to finance a purchase of that magnitude, and, even if he had the cash, EnQueue was not worth that amount of money.  However, Boyer indicated that if Wheeler was willing to accept some creative options, there was a possibility that they could put a package together.  Wheeler emphasized that his concerns were that he realize fair compensation for his investment in the company and that he and his consultants be given an employment opportunity within DMG.

12.  While EnQueue had some hard assets, such as desks and computers, and intellectual property in the form of training manuals and methodologies, its primary value to DMG was its book of business, the so-called "pipeline."  "Pipeline" is a term of art among the businesses that engage in this sort of consulting work.  Pipeline contacts are "on the books" because they are actively being pursued and are likely, to varying degrees of probability, to result in a completed contract.  Among those in this business who regularly did business with Business Objects, the pipeline's probability percentage rating system was a significant measure of the likelihood that a specific lead was going to develop into a completed contract.

13.  Bill Wheeler did not keep his pipeline current based on industry standards. Bob Wing, EnQueue's sales representative, had educated himself about the Business Objects pipeline methodology, the significance of the probability rating, and the need to eliminate from the pipeline contacts that were not currently "active."  Before the June 10, 2005, pipeline spreadsheet report was prepared and sent to DMG for its review, Wing

suggested to Wheeler that the pipeline contained stale information and that the list should be updated. Wheeler told him to send it to DMG as is.

14. A large portion of the meeting in Hampton, Virginia was devoted to a review of the pipeline spreadsheet (Def. Ex. # 3). Wheeler updated DMG representatives about specific contacts and contract developments. DMG concluded, based on Wheeler's presentation, that there was approximately 2.4 million dollars of overall business in the pipeline. DMG came up with 1.3-1.4 million dollars of business in the next six months to one year and an impressive $ 400,000 - $ 500,000 worth of business in the next 120 days, giving even more legitimacy to Wheeler's claims of urgency in light of the impending IRS threat to rescind the employer identification number. Wheeler agreed with DMG's assessment of the pipeline.

15. After reviewing the pipeline and conferring privately with his management team, Boyer made an offer to Wheeler. Boyer and Schmidtknecht both recognized that they had performed no "due diligence" inquiry before making this offer and therefore they felt they could only protect DMG by making the offer contingent on revenue generated by EnQueue's book of business. They told Wheeler that a fair purchase price predicated upon a percentage of the amount of anticipated revenue would be between $ 250,000.00 - $ 275,000.00. Wheeler agreed and said his asking price was $ 275,000.00.[3] That figure became identified as the "goal" in the MOU that was ultimately drafted.

---

[3]    It is at this point that the testimony about the negotiations becomes wildly divergent. Wheeler, as the sole EnQueue representative who testified, says that DMG then proceeded to offer him $ 290,351.00, the amount identified by the label "actual payout" on Appendix C of the Memorandum of Understanding and more than his demand. I simply do not accept his testimony that DMG agreed to pay that amount not conditioned on revenues. Interestingly, Wheeler did not testify that the parties agreed that $ 275,000.00 was a floor and he was to receive that amount regardless of revenue generated. The $ 275,000.00 figure is identified as the "goal" on Appendix C and that language is consistent with Boyer's testimony that the figure was used because it was Wheeler's asking price and they first established the amount of revenue needed to justify that asking price. Wheeler stated that his understanding of the MOU he signed was that

16.  A significant motivation for DMG was the desire to have Adrian So come to work for the company.  Throughout 2005 and into the Spring of 2006 So was steadily engaged on a major project for Johnson and Johnson.  As part of this entire package DMG offered at will employment contracts to So, Wheeler, Houze, Garrett, and Bob Wing, the sales representative.  So, Wheeler, and Garrett were to receive $ 100,000 per year.  Houze was to receive $ 110,000.00, plus commissions, plus a fixed payment portion of whatever the ultimate payout might have been.[4]  The salary offers were based upon DMG's in-house salary scale and with the exception of Houze's package were presented as "take it or leave it" offers.  As additional protection for DMG, the contract provided that if an employee chose not to come work for DMG, the payout would be reduced based upon the loss of anticipated revenue at the rate of $ 50,000.00 per consultant and if a consultant left before the end of one year there would be a proportionate reduction in the sales price, prorated to the number of months actually worked.  The three consultants generated revenue and it was anticipated that their revenue would pay their salaries and finance the purchase.  Wing and Wheeler were to generate the business to put the consultants to work either by direct sales or the continued management of projects in the pipeline.  Wheeler's title was to be "practice director" and

---

he was to receive $ 290,351.00 regardless of revenue generated.  That amount was the "actual payout." Houze, the other EnQueue representative at this meeting, did not testify on behalf of either party and I do not know his version of events.  By and large, though, I found credible Boyer's and Schmidtknecht's version of events which was that they made clear to Wheeler that their offer was contingent on a percentage of revenue with an "accelerator" which would increase the payout if the revenues generated exceeded the goal of 1.37 million dollars.  If only 1.37 million dollars of revenue was generated the payout would be only $ 275,000.00.   If the revenue was less than 1.37 million there would be a corresponding percentage reduction in the payout.

[4]      Houze had some ownership interest in the company. He went to the negotiations with what Wheeler viewed as inflated demands regarding his salary.  Eventually Houze negotiated separately with Boyer and they agreed upon salary terms.

it was anticipated he would oversee the projects in the pipeline and perhaps new SAP work that came into the company.

17.  Wheeler had not anticipated that Bob Wing would be part of the DMG package because he knew DMG had its own active sales force.  In fact, Wheeler told Wing that once EnQueue was sold he would be out of work.  However, Boyer recognized that much of the work in the pipeline presented to him represented Wing's contacts and Boyer felt he wanted to keep the entire team intact so he offered Wing a sales job with DMG.

18.  Toward the conclusion of the meeting the "agreement" between the parties was reduced to writing in the form of a Memorandum of Understanding accompanied by three attachments.  The MOU was neither drafted nor reviewed by any attorney for either side.  Its terms are vague.  The sale price is stated as "up to $ 300,000.00."  Appendix C to the MOU displays anticipated revenue and has two alternative payout schedules.  One of the payouts is $ 275,000.00 and one is $ 290,351.00.  The Appendix clearly has a percentage relationship between the amount of the payout and the revenue generated. The written contract is silent on what is to happen if the revenue generated is less than the stated goal of 1.37 million dollars, but Boyer conveyed to Wheeler his intent that payment was entirely contingent upon the amount of revenue the EnQueue employees were able to generate.  Both sides signed the MOU.

19.  All of the named EnQueue staff accepted DMG's employment offers and they began work effective July 5, 2005.  The group did not physically relocate to Virginia. Wheeler remained in Maine, the three consultants continued to work on assignment at differing locales, and Wing moved to Virginia.  During the month of July only So and

8

Garrett generated any income, So billing for $15,500.00 and Garrett for $ 5,200.00, totaling $ 27,500.00 of the anticipated revenue of between $ 53,000.00 - $ 55,000.00.

20.   One of the reasons for the drop in revenue in July was that Business Objects adopted a new system for assigning its subcontractors such as DMG and EnQueue.  The new system was known as BORS and it was manned by new faces totally unfamiliar to Wheeler.  Neither party had anticipated this significant change at Business Objects. Furthermore, for reasons unknown to Wheeler, he lost a significant account at Ascensia, the contracting arm of the AllState account, a very significant account in the pipeline. Boyer did not raise any significant issues with Wheeler about July's revenue nor did he pay Wheeler the $ 30,000.00 "fixed payment"  for July listed in Appendix C.  Wheeler made no demand for payment either.  Appendix C does state that the payment is "fixed" only if the "running total stays > 100 %."  Clearly $ 27,500.00 is not 100% of either $ 53,000.00 or $ 55,000.00, the goal revenue or the anticipated excess revenue for July according to Appendix C.  Wheeler received a $ 15,000.00 payment in the month of July.

21.   Around the first of August Bob Wing and his new boss at DMG, Jeff Gates, came to see Boyer.  Gates told Boyer that there was a "challenge with the pipeline." Wing explained to Boyer that the pipeline had not been updated as it should have been, at least as to his accounts and also probably as to Wheeler's.  Wing said he told Wheeler before he went to Virginia for the June meeting that the pipeline should be cleared out, old contacts removed, and the probabilities reassessed based upon the amount of time that had passed since the last contact.  Wing understood from his own independent research with the Business Objects model that the pipeline and its percentage

probabilities had specific meaning within the field and that if something was listed as 100 % probable it meant that a contract was signed and it was ready to start. Other percentage figures had specific meaning as well to identify exactly how far into the process the deal had gone.

22. Boyer did not immediately confront Wheeler with this information because he felt he did not have all the facts. He instructed Wing to rework the pipeline. Ultimately he received a revised pipeline from Wing that showed between $ 300,000.00 and $ 500,000.00 of work actually in the pipeline as opposed to the 2.4 million that had originally been in the pipeline and which Boyer had discounted to 1.37 million in framing his offer. In August the only significant new pipeline work was the Rockwell Collins account that came in at $ 26,200.00, generated by Houze and Garrett. Adrian So continued the pipeline work at Johnson and Johnson. Because Houze and Garrett had been "on the bench" for a significant amount of time in July, Garrett did some work on an existing DMG account that was not pipeline work. The pipeline-related billing for August amounted to $ 47,950.00 of the anticipated revenue goal of $ 65,000.00.

23. In the third week of August Boyer contacted Wheeler and asked him to come to Virginia for a face to face meeting. Boyer presented Wheeler with a revised pipeline report, expressed his displeasure, and told Wheeler that he was going to withhold payments until the revenue stream improved. Wheeler blamed Bob Wing for the problems with the pipeline report and assured Boyer that things would improve. Ultimately Wheeler received another $ 15,000.00 in August.

24.  September was a very bad month.  The only pipeline income generated was So's $ 17,187.50.[5]  By October DMG was assigning Garrett and Houze to DMG contracts because there was no new work coming from the EnQueue  pipeline. Nevertheless, EnQueue was credited with $ 51,600.00 worth of income for the month of October.  Boyer remained on cordial terms with Wheeler, sending him encouraging e-mails when Adrian So had landed some new business.  The income goal for October had been $ 90,000.00 because the pipeline forecast an October bump in revenue.

25.  In September no payment was made to EnQueue and in October a payment of only $ 7,500.00 was made.  That was the last payment ever made to EnQueue under the MOU, bringing the total payments to $ 37,500.00.

26.  By November of 2005 Boyer found that Wheeler was becoming less responsive and less engaged in the process.  Boyer and Wheeler were not arguing and fighting during this time period, but Boyer was trying to micro-manage Wheeler's work and had him reporting directly to him.  Houze and Garrett were dissatisfied with Wheeler and no longer wanted to report to him.  Wheeler was only directing Adrian So's project and was performing other assigned duties in a lackluster fashion.  During the November end-of-year strategic planning cycle, Wheeler submitted a subpar planning report.  Although reluctant to fire employees during the holiday season, Boyer did

---

[5]         EnQueue has correctly pointed out that there is a discrepancy between Plaintiff's Ex. 16, a report of the three consultants earnings prepared by DMG before this litigation commenced, and Defendant's Ex. 12, a spreadsheet that displays the total revenue generated.  Some of the discrepancy is explained because one set of numbers came from time sheets submitted by the consultants and one set came from actual billings.  Schmidtknecht explained that sometimes the clients would not actually wind up being billed for all of the hours submitted.  Another discrepancy between the two exhibits involves a month to month variation as where Mike Garrett shows -0- in August and $ 17,000.00 in September on Pl's Ex.16 and almost the exact opposite on Defendant's Exhibit 12 which shows -0- for Garrett in September and $ 20,000.00 in August.  Those sorts of discrepancies actually support the defendant's explanation.  Having reviewed the two exhibits, I am comfortable relying upon Defendant's Ex. 12 even though I acknowledge that it was prepared during the course of the litigation.  That exhibit contains more information and appears more reliable.  Furthermore, Wheeler has not identified any specific pipeline work the consultants performed for which they have not received credit.

terminate Wheeler's employment with DMG.  So, Garrett, and Houze were notified and told they could remain with DMG and they all chose to do so, So for nine more months, Houze for 14 months and Garrett for 11 months.  All of the consultants remained with DMG for at least one year, fulfilling that portion of the MOU.

27.   Boyer's reasons for terminating Wheeler were multifaceted.  For one thing, DMG had absorbed four employees at the $ 100,000.00 salary level.  With the addition of approximately 20 % for benefits, each employee was costing the company approximately $ 10,000.00 per month.  The EnQueue pipeline was not consistently generating even enough revenue to pay the new salaries, let alone the payout arrangement.  While DMG was able to send the consultants to some of its own jobs, doing so cut into its profit margin because most of those jobs were not SAP projects and could have been handled by other consultants or subcontractors who would have been earning around $ 60,000.00 - $ 70,000.00 per year.

28.   Additionally, Wheeler's former business associates contacted Boyer asking questions about the payout, causing Boyer discomfort.  All of these factors taken together resulted in Boyer's decision to terminate Wheeler.

29.   After the termination no additional payments were ever made under the MOU, although according to DMG's own calculations it owes a total of  $ 68,213.56 to EnQueue and has only paid $ 37,500.00 of that amount.  By August of 2006 all of the income generated by the pipeline had been earned and by June of 2007 all three of the consultants were no longer working for DMG.   The hard assets and the SAP related knowledge continue to provide a small benefit to DMG, but DMG's focus is now on

government contracts and SAP is a commercial business-related product for which DMG has little use at the present.

30.  EnQueue did not receive any payments from DMG that were not properly earned under the MOU and was not unjustly enriched in any fashion by this transaction.

31.  Neither party deliberately misrepresented any material facts, but Wheeler was overly optimistic about his pipeline and woefully ignorant of the meaning of the terms he used to describe the probability of success with particular contacts.  Wheeler acknowledged that he did not use the Business Objects model when constructing and presenting his pipeline, but maintains that it was only at the August 2005 meeting with Boyer that he learned that Boyer believed his pipeline did meet the recognized criteria.

## II.  Conclusions of Law

### A.  Jurisdiction

This court's jurisdiction is based upon diversity pursuant to 28 U.S.C. § 1332. The amount in controversy is well in excess of $75,000.00.

### B.  Applicable Law

The written documents do not contain any choice of law provision.  Although a strong case could be made that Virginia law applies to this contract, neither side has made such an argument.  Both parties cite and rely upon Maine cases in their trial briefs.  I will therefore apply Maine law to facts of this case.

### C.  Fraud Claims

Both EnQueue and DMG have brought fraud claims against each other.  EnQueue claims that DMG fraudulently represented it would pay $ 300,000.00 according to a monthly schedule over a twelve month period.  DMG claims EnQueue fraudulently

misrepresented its pipeline in order to induce DMG to enter into this contract and to employ four former EnQueue employees.

In order to recover on a fraud claim, the party bringing the claim must persuade the Court, by clear and convincing evidence, that:  (1) the other party made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether the fact was true or false, (4) for the purpose of inducing the other party to act, and (5) that party  justifiably relied upon the other party's representations, which caused damages.  Me. Eye Care Assoc. v. Gorman, 2006 ME 15, ¶ 19, 890 A.2d 707, 711.  In this case I find that DMG made no false statement and I specifically reject Wheeler's testimony that DMG promised it would pay almost $ 300,000.00 for EnQueue regardless of the revenue stream produced from the pipeline.  On the other hand, EnQueue's representation about its pending business in the pipeline was clearly inaccurate and Wheeler made those representations after he was put on notice by Wing that some of the older information should probably have been weeded out of the pipeline. However, Wheeler did not have knowledge of the Business Objects' measurements for pipeline business and he did not act knowingly or recklessly in disregard of the truth when he presented his pipeline to DMG.  I am convinced that Wheeler believed that the business was in the pipeline and that all he needed was more consultants and the DMG "umbrella" to bring that business to fruition.  Unfortunately, he badly misjudged the potential, but that misjudgment on his part was not fraudulent.

### D.  Unjust Enrichment

In its counterclaim DMG brought a count based upon unjust enrichment.  To establish unjust enrichment, the complaining party must show that (1) it conferred a

benefit on the other party;  (2) the other party had appreciation or knowledge of the

benefit;  and (3) the acceptance or retention of the benefit would be inequitable without

payment of its value.  Id., 2006 ME 15, ¶ 26, 890 A.2d at 712.  EnQueue has not received

any benefit from DMG under circumstances that make it inequitable for EnQueue to

retain the benefit.  In fact, as discussed below, EnQueue is actually entitled to more

money, based upon DMG's own evidence, for the benefit it conferred upon DMG.

**E.  Breach of Contract**

EnQueue argues that the parol evidence rule operates in this case to exclude from

my consideration any extrinsic evidence which would alter, augment or explain the

language of the MOU and attached exhibits.

> The parol evidence rule operates to exclude from judicial consideration
> extrinsic evidence offered to alter, augment, or contradict the
> unambiguous language of an integrated written agreement.  Application of
> the rule requires an initial finding that the parties intended the writing to
> integrate their understandings concerning the subject matter of their
> agreement.

Handy Boat Serv., Inc. v. Professional Servs., Inc., 1998 ME 134, ¶ 11, 711 A.2d 1306,

1308-1309.  The issue of whether contract language is ambiguous is a question of law

and the interpretation of ambiguous language is a question of fact.  Portland Valve, Inc.

v. Rockwood Sys. Corp., 460 A.2d 1383, 1387 (Me. 1983).  In this case it is apparent that

the contract language is ambiguous.  Paragraph 1.5 refers to a purchase price of "up to $

300,000.00 as stated in attached Schedule 'C'."  Appendix C is an exceedingly ambiguous

document.  It references revenue, a goal, and an actual payout with related percentage

amounts broken down into the form of monthly amounts for a twelve month period.  It

also notes that the first four monthly payouts are fixed amounts, if the running total stays

greater than 100 %.  There is also a reference to a payout for Geoff Houze of

$ 15,000.00, although the document does not explain if that is separate from, or part of the remainder of the payout.  Because it is filled with ambiguities, one must look to extrinsic evidence to understand Appendix C.   The MOU references Appendix C as the description of the method of payment and thus Appendix C must be deciphered in order to learn the terms of this contract.  There is no language to indicate that the MOU is a fully integrated document and, indeed, the most essential term of the contract, the actual purchase price, is simply not to be found anywhere on the document.  Appendix C contains the essential contract terms regarding payout.  Thus, as a matter of law, the contract is ambiguous and can only be understood by reference to Appendix C, a document that itself requires parole evidence to be understood.

The extrinsic evidence that explains the contract is the testimony of Boyer and Schmidtknecht, plus Defendant's Exhibit 7, which more clearly shows the percentage relationship between the payout and the revenues.  As the exhibit's language demonstrates, if the actual revenue was equal to the goal revenue, then the payout was at 100 % and other than that the payout would be based upon the percentage relationship of revenue to the goal.  Boyer and Schmidtknecht testified to the same general formula and I am satisfied that this agreement was reached between the parties.

Given this interpretation of the contract, DMG's failure to make any additional payments after Wheeler was terminated was clearly a breach of the purchase and sale agreement.  The EnQueue pipeline continued to generate revenue, best exemplified by Def.'s Ex.  #12, until July 2006.  According to DMG's own calculations they should have paid EnQueue $ 68,213.56 during the one year contract term.  Instead they paid

16

$ 37,500.00, leaving a balance owed of $ 30,713.56 and judgment should enter for EnQueue in that amount.

### F.   Attorney fees

EnQueue has made a request to recover its attorney fees.  Maine follows the so-called American rule, which provides that litigants generally bear the expense of their own attorney fees in the absence of specific statutory authority, court-created exceptions, or contractual provisions to the contrary.  Linscott v. Foy, 1998 ME 206, ¶ 16, 716 A.2d 1017, 1021.  One court-created exception allows an award of attorney fees in a breach of contract action as a sanction for particularly egregious conduct.  Id.; Sorley v. Karll, 2004 ME 89, ¶ 10, 853 A.2d 755, 758.   Nothing DMG has done is particularly egregious.  Its breach was garden variety in that it failed to pay what was due in a timely fashion.  That conduct does not warrant an award of attorney fees.  Nor is there any contractual provision or statutory provision that would warrant attorney fees in this situation.

### G.   Prejudgment Interest

Maine statutory law entitles prevailing civil plaintiffs to prejudgment interest as a matter of right.  14 M.R.S. ¶ 1602-B, see also Crowe v. Bolduc, 365 F.3d 86, 89 (1st Cir. 2004).   In this case EnQueue is entitled to that prejudgment interest computed in the manner required by section 1602-B(3), meaning prejudgment interest is allowed at the one-year United States Treasury bill rate plus 3 %,  as there is no contractual provision for interest in this MOU and therefore the rate applicable to all other civil actions would apply.

**Conclusion**

Based upon the foregoing findings of fact and conclusions of law, the clerk is directed to enter judgment as follows:

1.  On Count I of the complaint, breach of contract, judgment is entered for the plaintiff, EnQueue, Inc. in the amount of $ 30,713.56, plus prejudgment interest and costs.

2.  On Count II of the complaint, fraud, judgment is entered for the defendant, Data Management Group, Inc.

3.  On Counts I – III of the counterclaim, breach of contract, fraud, and unjust enrichment, judgment is entered for the counterclaim defendant, EnQueue, Inc.

4.  The third party complaint against Bill Wheeler has been voluntarily dismissed by DMG.


*So Ordered.*

July 22, 2008                                    /s/ Margaret J. Kravchuk
                                                 U.S. Magistrate Judge

18